AO 106 (Rev. 06/09)    Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Eastern District of Missouri

**FILED**

JUL 09 2020

U.S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

| | |
|---|---|
| In the Matter of the Search of <br><br> IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USER IDs IDENTIFIED IN ATTACHMENT A THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK, INC. | Case No. 4:20 MJ 7200 SPM <br><br> SIGNED AND SUBMITTED TO THE COURT FOR FILING BY RELIABLE ELECTRONIC MEANS |

## APPLICATION FOR A SEARCH WARRANT

I, ____James Gaddy____ , a federal law enforcement officer or an attorney for the government request a search warrant and state under penalty of perjury that I have reason to believe that on the following property:

SEE ATTACHMENT A.

located in the ____NORTHERN____ District of ____CALIFORNIA____ , there is now concealed

SEE ATTACHMENT B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ✓ evidence of a crime;
- ✓ contraband, fruits of crime, or other items illegally possessed;
- ✓ property designed for use, intended for use, or used in committing a crime;
- ❏ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| Title 21, U.S.C., §§ 841(a), 843, 846 <br> Title 18, U.S.C. §§ 2, 922, 924 | Conspiracy to possess with intent to distribute controlled substance(s); firearms offenses |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE.

- ✓ Continued on the attached sheet.
- ❏ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

I state under the penalty of perjury that the foregoing is true and correct.

_____
*Applicant's signature*

JAMES GADDY, Task Force Officer
DEA
_____
*Printed name and title*

*Sworn to, attested to, or affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41.*

Date: ____July 9, 2020____

_____
*Judge's signature*

City and State: ____St. Louis, MO____

Hon. Shirley P. Mensah, U.S. Magistrate Judge
*Printed name and title*
AUSA:    John Mantovani

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Facebook account(s) and/or user ID(s):

> (a) "Ron   Hill"   (**https://www.facebook.com/profile.php?id=100007214386526**)
> (**ID#100007214386526**), an account believed to be utilized by Ron HILL
> (**Subject Account #1**);

that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company located at 1601 Willow Road, Menlo Park, CA 94025.

1

## ATTACHMENT B

### Particular Things to be Seized

**I.      Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f),

Facebook is required to disclose, from June 1, 2016 to present, the following information to the government for the account(s) and user ID(s) listed in Attachment A:

(a)      All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers;

(b)      All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

2

(c)     All records or other information regarding the devices and internet browsers associated with, or used in connection with, that account and user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(d)     All "check ins" and other location information;

(e)     All IP logs, including all records of the IP addresses that logged into the account;

(f)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(g)     All information about the Facebook pages that the account is or was a "fan" of;

(h)     All past and present lists of friends created by the account;

(i)     All information about the user's access and use of Facebook Marketplace;

(j)     The types of service utilized by the user;

(k)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(l)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(m)     All records pertaining to communications between Facebook and any person regarding the user or the account and user ID, including contacts with support services and records of actions taken.

3

(n)     Any and all cookies associated with or used by any computer or web browser associated with the account, including the IP addresses, dates, and times associated with the recognition of any such cookie;

(o)     All records of Facebook searches performed by the account;

(p)     All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(q)     All photos and videos uploaded by that account and user ID and all photos and videos uploaded by any user that have that user tagged in them, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(r)     All location data associated with the account created, uploaded, or shared by the account;

(s)     All other records and contents of communications and messages made or received by the user, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests.

**Facebook is hereby ordered to disclose the above information to the United States within 14 days of the date of this warrant.**

## II.     Information to be seized by the United States

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 21, United States Code, Sections 841(a), 843, and 846 and Title 18, United States Code, Sections 2, 922(g), and 924(c) involving Ron HILL, and others known and unknown from October 1, 2019 to present, including, for each account or user ID identified on Attachment A, information pertaining to the following matters:

(a) the sale of illegal drugs and steps taken in furtherance of schemes to sell illegal drugs;

(b) the possession of illegal firearms and steps taken in furtherance of schemes to come into possession of said firearms;

(c) the use of phones in furtherance of narcotic sales;

(d) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(e) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(f) The identity of the person(s) who created or used the account(s) or user ID, including records that help reveal the whereabouts of such person(s).

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Facebook, and my title is

_____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Facebook. The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Facebook, and they were made by Facebook as a regular practice; and

b.      such records were generated by Facebook's electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Facebook in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by Facebook, and at all times pertinent to the records certified here the process and system functioned properly and normally.

6

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____     _____
Date                                Signature

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

IN THE MATTER OF THE SEARCH OF   )
INFORMATION ASSOCIATED WITH     )   No. 4:20 MJ 7200 SPM
FACEBOOK USER IDs IDENTIFIED IN    )
ATTACHMENT A THAT IS STORED AT   )
PREMISES CONTROLLED BY            )   FILED UNDER SEAL
FACEBOOK, INC.                      )
                                 )   SIGNED AND SUBMITTED TO THE COURT FOR FILING
                                 )   BY RELIABLE ELECTRONIC MEANS

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, James Gaddy, being first duly sworn by reliable electronic means, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.    I make this affidavit in support of an application for a search warrant pursuant to 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) and Federal Criminal Procedure 41 for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. The requested warrant would require Facebook to disclose to the United States records and other information in its possession, pertaining to the subscriber or customer associated with the user ID as further described in attachment B.

2.    I am a Task Force Officer with the Drug Enforcement Administration (DEA) and have been since 2010. I have been a deputized Task Force Officer with the Drug Enforcement Administration (DEA) since January 2010 and am currently assigned to an Enforcement Group

1

of the St. Louis Division Office.  Prior to my DEA assignment, I was a sworn police officer with the St. Charles County Police Department and Breckenridge Hills Police Department for approximately 20 years.   During the course of my law enforcement experience I have participated in numerous investigations involving controlled substances.   I have conducted investigations of a variety of illegal drug-trafficking and money-laundering organizations.  I have participated in investigations which led to the seizure of illegal drugs, weapons, and assets derived from the sale of illegal drugs, and the subsequent felony arrests of those individuals involved.   I have participated in numerous drug-related training courses throughout my law enforcement career.   I am familiar with and have used normal methods of investigation, including, but not limited to, visual and electronic surveillance, questioning of witnesses and defendants, the use of search and arrest warrants, the use of informants, the use of pen registers, the utilization of confidential sources and undercover agents, and the use of court-authorized wire and electronic intercepts.  Through the course of my training and experience, I am familiar with methods employed by narcotics distributors to conduct their business and to subvert law enforcement detection including, but not limited to, the use of multiple communication platforms to compartmentalize their activity.  I am further familiar with how social media has increasingly become a method for both communicating about drug and weapon activity and a vehicle to showcase that activity.  As these social media sites can be accessed from cellular devices, many individuals utilize social media to both brag about their illicit activity and use its messaging services to subvert law enforcement detection.

3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended

to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841(a), 843, and 846 and Title 18, United States Code, Sections 2, 922(g), and 924(c) have been committed by Ron HILL aka "Skan", and others known and unknown.  There is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

## JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## LOCATION(S) TO BE SEARCHED

6.      The location(s) to be searched is (are):

**(a) "Ron      Hill"      (https://www.facebook.com/profile.php?id=100007214386526) (ID#100007214386526)**, an account believed to be utilized by Ron Hill (hereinafter the "**Subject Account**"); and

located at 1601 Willow Road, Menlo Park, CA 94025, further described in Attachment A.  The items to be reviewed and seized by the United States are described in Part II of Attachment B.

## BACKGROUND RELATING TO FACEBOOK

7.      The Internet is in part a computer communications network using interstate and foreign telephone and communication lines to transmit data streams, including data streams used

3

to provide a means of communication from one computer to another and used to store, transfer and receive data and image files.

8.      An "Internet Protocol" (IP) address is a unique series of numbers, separated by a period, that identifies each computer using, or connected to, the Internet over a network.  An IP address permits a computer (or other digital device) to communicate with other devices via the Internet.  The IP addresses aids in identifying the location of digital devices that are connected to the Internet so that they can be differentiated from other devices.  As a mailing address allows a sender to mail a letter, a remote computer uses an IP address to communicate with other computers.

9.      An "Internet Service Provider" (ISP) is an entity that provides access to the Internet to its subscribers.

10.     The term "remote computing service" means the provision to the public of computer storage or processing services by means of an electronic communications system.

11.     Facebook is a business and company that operates as a remote computing service, a provider of electronic communications services through ISPs.  Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

12.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical

4

address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

13. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter. Facebook can identify all users who are currently registered to a particular group and can identify the administrator and creator of the group. Facebook uses the term "Group Contact Info" to describe the contact information for the group's creator and administrator, as well as the current status of the group profile page.

14. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

15. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Depending on the user's privacy settings, Facebook may also obtain and store the physical location of the user's device(s) as they interact with the Facebook service on those

device(s).  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

16.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

17.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video.  It also provides users the ability to "tag" (*i.e.*, label) other Facebook users in a photo or video.  When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.  For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.  Facebook users can exchange private messages on Facebook with other users.  Those messages are stored by Facebook unless deleted by the user.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  Facebook allows users to edit or delete

6

comments on their own profile pages, and users can adjust their profile settings to allow them to pre-approve comments on their own profile pages.

18.     In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger.  These chat communications are stored in the chat history for the account.  Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

19.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

20.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

21.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

22.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

23.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

24.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform.  When a

7

Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

25.    Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

26.    Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.  When a given Facebook account is deleted, Facebook retains certain information relating to that account for some period of time, including user identity information, IP logs, and other data.  Even if a given user deletes data, Facebook stores such data for extended periods of time on Facebook's servers.

27.    Messages, photos, audio videos, and other records stored on Facebook server by a subscriber may not necessarily be located in the subscriber's home/work computer.  The subscriber or user may store data on Facebook servers for which there is insufficient storage

space in the subscriber's computer and/or which he/she does not wish to maintain in the computer at his/her residence or employment. A search of the files in the computer at the subscriber's residence or place of employment will not necessarily uncover the files that the subscriber has stored on the Facebook server. Therefore, the computers of Facebook are likely to contain all the material just described, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and account application.

28.     By their very nature, websites, social networking accounts, and internet-based applications described herein are kept and stored in computers and electronic-memory devices by the host companies, in addition to or in lieu of hard-copy versions of this data. Because such evidence is stored electronically, the data and evidence of the crimes described herein may be stored and be present for long periods of time.

29.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

30.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a

residence.  For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time.  Further, Facebook account activity can show how and when the account was accessed or used.  For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation.  Additionally, Facebook builds geo-location into some of its services.  Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other.  This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner.  Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation.  For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

## INVESTIGATION AND PROBABLE CAUSE

### A. Background of Investigation:

31.     In January 2019, during a separate DEA St. Louis investigation (indicted as in May of 2019 as *United States v. Guy Goolsby et al*, under Cause No. 4:19-CR-00412 AGF PLC), investigators learned of Keyshia HARRIS' (HARRIS) involvement in the distribution of heroin

10

and/or fentanyl in the St. Louis Metropolitan from a Source of Information ("SOI"). The SOI indicated HARRIS was a member of the violent St. Louis-based street gang the "270 Sullivan Mob." The 270 Sullivan Mob is a criminal street gang that has been engaging in criminal activities in the area of the 2700 block of Sullivan Avenue in South St. Louis City for decades. Additionally, the SOI believed HARRIS was being sourced with heroin and/or fentanyl by Guy Goolsby ("Goolsby"), another known member and source to the 270 Sullivan Mob and the lead defendant in the multi-person cocaine, heroin and fentanyl distribution conspiracy transporting and distributing multi-kilograms quantities of drugs from Mexico, through Texas and Florida, to the St. Louis area referenced above. At the present time, Goolsby is being held by the United States Marshal Service until his case is fully adjudicated. Since Goolsby's indictment and confinement, investigators have learned HARRIS has continued to distribute ounce quantities of heroin / fentanyl and is believed to have acquired new sources of supply other than Goolsby. This belief is based on information from two confidential sources (hereinafter: "CS-1" and "CS-2"), recorded telephone conversations with HARRIS over her court-authorized monitored cellular device (hereinafter: "target telephone #1"), and several controlled purchases from HARRIS.

**B.     Interceptions of Ron HILL over HARRIS's Target Telephone #1.**

32.     On October 2, 2019, United States District Court Judge Henry E. Autrey, Eastern District of Missouri, issued an order authorizing the interception of wire and electronic communications to and from target telephone #1, known to be utilized by HARRIS (Cause No. 4:19 MC-00720-HEA). Interception of this telephone occurred between October 2, 2019 and October 31, 2019. As a result of the court-authorized wire and electronic intercepts, investigators learned HARRIS' paramour, DeVaughn LEE (LEE) was being supplied various

11

quantities of fentanyl by Ron HILL (HILL).[1]   Results of the intercepted communications obtained pursuant to this order are discussed in more detail below demonstrate HILL's drug-related activities.

33.     On or about October 4, 2019, investigators began to monitor numerous intercepts over HARRIS' target telephone #1 concerning LEE being arrested and detained by the St. Louis Metropolitan Police (SLMPD) for operating a stolen motor vehicle.

34.     On October 5, 2019 at approximately 8:41 a.m. (Call Session: 236) investigators intercepted a call between HARRIS using target telephone #1 and LEE while LEE was in a correctional institution for the SLMPD arrest.  During that call, LEE told HARRIS to "holler at P…tell him ("P") I (LEE) say uh…stick to the mission."  LEE continued "I'll (LEE) be around in a hot second."  Investigators are confident based on training, experience, and the instant investigation, LEE was telling "P" to "stick to the mission" meaning "P" should continue to distribute fentanyl for the organization to avoid any interruption in profits while LEE was incarcerated.  LEE also assured HARRIS that he would not be in jail that long, stating that he (LEE) will "be around in a hot second."

35.     A short time later, investigators began to intercept calls between HARRIS and two of LEE's close criminal associates and/or source(s) who at time where only identified as "P"

---

[1]      A review of at least one criminal history database reveals that HILL was arrested for offenses that include the following: On or about August 28, 1997, HILL was convicted of felony possession of controlled substance and sentenced to five (5) years confinement. On or about August 21, 2000, HILL was convicted of felony possession of controlled substance and sentenced to five (5) years confinement.  On or about December 16, 2005, HILL was convicted of felony possession controlled substance, felony resisting arrest, 2 counts of felony assault on law enforcement and sentenced to five (5) years confinement.  On or about June 15, 2006, HILL was convicted of the federal charge of felon in possession of a firearm in the Eastern District Missouri and sentenced to 18 months confinement in Federal prison.  On or about November 2, 2010, HILL was convicted of the federal charge of produces/traffics in counterfeit device in the Eastern District Missouri and sentenced to 36 months confinement in Federal prison.

(still unidentified) and "Skan" (later positively identified as Ron HILL.)    During these intercepted calls, "P" was using Michigan-based telephone number (313) 784-5384, and HILL was using Missouri-based telephone number (314) 229-0883.

36.    On October 7, 2019 at approximately 11:49 a.m., investigators monitored an outgoing call from target telephone #1, used by HARRIS, to HILL (Call Session: 477).   During this conversation between HARRIS and HILL, HILL asked HARRIS if HARRIS "got it" or if "P" from the projects "got it."   Portions of the transcribed telephone conversation are directly quoted and explained below.  In light of the coded language, I have set out in parenthesis what investigators believe to be the meaning of the language based upon my training, my experience, and Confidential Sources.

a.    October 7, 2019 – 11:49 a.m.: Incoming call from HARRIS on target telephone #1 to HILL on (314) 229-0883.

| | |
|---|---|
| HILL: | Who got it (remaining drugs)? Dude "P" (unknown criminal associate of LEE's) in the projects got it (drugs) or do you (HARRIS) got it (drugs)? |
| HARRIS: | Got what? |
| HILL: | Dude in the projects ("P") got that (drugs) or do you (HARRIS) got that? |
| HARRIS: | I got nothing to do with none of it...what's his name ("P") supposed to have it (drugs). |
| HILL: | Alright.  I'm about to go grab it (drugs). |

Through training, experience, and the instant investigation, investigators believe the conversation consisted of HILL asking HARRIS who was currently in possession of the drug supply HILL had provided to LEE prior to LEE's incarceration on October 4, 2019.  Investigators believe that HARRIS and HILL were referencing drugs ("it") during this conversation (Call Session 477)

which was further confirmed during a call a few hours later (Call Session 580,) as detailed below.

37.     On October 7, 2019 at approximately 1:13 p.m., investigators monitored an outgoing call from HARRIS, using target telephone #1 to Michigan-based telephone number (313) 784-5384, used by "P" (Call Session: 498).   During this conversation between HARRIS and "P," HARRIS told "P" she (HARRIS) spoke to HILL and that during that conversation, HILL was inquiring about the location of the drugs LEE had prior to LEE's arrest, and if HARRIS or "P" was actually in possession of LEE's drugs.   Portions of the transcribed telephone conversation are directly quoted and explained below.   In light of the coded language, I have set out in parenthesis what investigators believe to be the meaning of the language based upon my training, my experience, and the instant investigation.

b.     October 7, 2019 – 1:13 p.m.: Outgoing call from Michigan-based telephone number (313) 784-5384, used by "P" to HARRIS, using target telephone #1.

| HARRIS: | What's going on P? This K-Hard (HARRIS). |
|---|---|
| P: | What's up with it? |
| HARRIS: | [HARRIS is relaying verbatim to "P" an earlier conversation between HARRIS and HILL] Dude (HILL) calling me saying, "do you got that (drugs)? And I said…got what?  He (HILL) said well dude ("P") must got it (drugs)…what you (HILL) calling about a punk ass half (a half ounce of drugs). |
| P: | You (HARRIS) know what he (HILL) talking about? |
| HARRIS: | He (HILL) was calling about getting the rest of that stuff (drugs) Ali (alias used by LEE) had. |

Through training, experience, and the instant investigation, investigators believe the conversation consisted of HARRIS recounting verbatim to "P" an earlier conversation between HARRIS and

HILL during which HILL asked HARRIS about the location of LEE's drugs. HILL was asking HARRIS if either HARRIS or "P" had those drugs.

38.     Minutes later on October 7, 2019 at approximately 1:30 p.m., investigators monitored an outgoing call from HARRIS's target telephone #1, used by HARRIS, to Michigan-based telephone number (313) 784-5384, used by "P" (Call Session: 506).   During this conversation between HARRIS and "P," HARRIS referenced the above-described October 5, 2019 conversation between HARRIS and LEE during Call Session: 236.   Portions of the transcribed telephone conversation are directly quoted and explained below.   In light of the coded language, I have set out in parenthesis what investigators believe to be the meaning of the language based upon my training, my experience, and the instant investigation.

c.      October 7, 2019 – 1:30 p.m.: Outgoing call to Michigan-based telephone number (313) 784-5384, used by "P," from target telephone #1.

| HARRIS: | Ali (alias used by LEE) told me (HARRIS) to tell you ("P") to keep doing what your doing (continue to distribute fentanyl for LEE)…keep doing what your doing (distributing for LEE)…you ("P") know what I'm saying? |
| --- | --- |
| P: | Yeah…I got him (LEE). |
| HARRIS: | He (LEE) keep doing what your doing (distributing fentanyl for LEE).   That's exactly what he (LEE) told me (HARRIS). |

When HARRIS stated, "keep doing what you're doing," investigators, through training, experience, and the instant investigation, believe the conversation between HARRIS and "P" consisted of HARRIS relaying a message from LEE, instructing "P" to continue to distribute fentanyl for the organization.   Based on investigators knowledge of LEE's past criminal history of drug trafficking, LEE's drug distribution activities during the instant investigation, and

15

numerous intercepted conversations, investigators are confident "keep doing what your doing" and/or "stick to the mission" are intentionally vague a coded phrases meaning for "P" to continue drug distribution for LEE.

39.     On October 7, 2019 at approximately 7:11 p.m., investigators monitored an incoming call to HARRIS' target telephone #1, used by HARRIS, from HILL (Call Session: 580).   During this conversation between HARRIS and HILL, HILL informed HARRIS, he ("HILL") picked up the drug supply from "P" and wanted to relay a message to LEE that "P" only provided HILL with "eleven hizzies," which investigators believe to be a quantity of fentanyl.     Portions of the transcribed telephone conversation are directly quoted and explained below.  In light of the coded language, I have set out in parenthesis what investigators believe to be the meaning of the language based upon my training, my experience, and Confidential Sources.

    d.     October 7, 2019 – 7:11 p.m.: Outgoing call to HILL on (314) 229-0883 from HARRIS on target telephone #1.

| | |
|---|---|
| HILL: | Hey, I just left…this dude P's house. |
| HARRIS: | Yeah. |
| HILL: | Man, tell dude (LEE)…they ("P") only wanna give me (HILL). |
| HARRIS: | What did you say? |
| HILL: | When bruh (LEE) call you (HARRIS), tell him (LEE) P only gave me eleven (11) hizzies (quantity of fentanyl).  Where the rest of the shit (drugs)? |

Through training, experience, and the instant investigation, investigators believe the conversation between HARRIS and HILL consisted of HILL informing HARRIS to relay a message to LEE that "P" only provided HILL with "eleven hizzies" (quantity of fentanyl.)   HILL was asking

16

where the rest of the drugs were since HILL had provided LEE with more than eleven ounces and/or grams prior to LEE's arrest.

### C.    Initial Discovery and Identification of Subject Account.

40.    Following the identification of HILL, I conducted a search for HILL on social media outlets such as Facebook. I immediately found HILL's Facebook Page (**Subject Account**), with assigned Facebook Profile Name as "Ron Hill."[2] I located numerous photos posted in the publically accessible areas of the **Subject Account**, which depict HILL (who I immediately could identify) to be consistently staying at various hotels throughout the City of St. Louis. Additionally, I determined from reviewing the numerous photos attached to the **Subject Account** that HILL drives several different makes and models of luxury vehicles. This led me to believe that HILL typically utilizes a rental specific vehicle for a short period of time before returning it for another rental vehicle. Also, I viewed several posted videos of HILL smoking what appeared to be marijuana. However, as I attempted to inspect more the **Subject Account**, I was limited to only viewing certain "public" aspects of the **Subject Account** based on HILL's privacy settings.

---

[2]    Facebook is a social media website that can be accessed from devices with Internet connectivity, such as personal computers, tablets and smartphones. After registering, users can create a profile revealing information about themselves. They can post text, photos and multimedia which is shared with any other users that have agreed to be their "Facebook Friend", or, with a different privacy setting, with any reader. Users can also use various embedded apps, join common-interest groups, buy and sell items or services on Marketplace, and receive notifications of their Facebook friends' activities and activities of Facebook pages they follow. Facebook offers several privacy options for their users, public, private, or selectively private. If a particular Facebook page is setup as "public", anyone, including someone that is not considered a "Facebook Friend," is able to view all of that user's content. However, if the Facebook user sets his/her page to be completely "private", only those accepted as "Facebook Friends" have access to view any of the content. The user may also choose that only some of their material, their list of friends, photographs, posts, and/or videos to be "private" and other material can be "public." Lastly, I am aware of Facebook Messenger, which is a "private chat", where only those communicating back and forth, either individually or in a group setting are able to see or hear the communication.

**D.    Geo-location Tracking of Hill's Cellular Device.**

41.     On October 9, 2019, the Honorable Nannette A. Baker, United States Magistrate Judge, Eastern District of Missouri, issued a Precision Location Warrant (PLW) that authorized the interception of GPS coordinates of HILL's cellular device numbered (314) 229-0883. (Cause No. 4:19-MJ-5364-NAB.)

42.     On or about October 11, 2019, investigators began to receive GPS data associated to HILL's cellular device.  Investigators immediately discovered HILL primarily stayed in various hotels within the downtown area of St. Louis, specifically during the overnight hours. Investigators quickly discovered the GPS "pings" for HILL's cellular device varied from 20 to 1500 meters, which caused great difficulty pin-pointing HILL's exact location and found the "pings" to be delayed by 15 to 20 minutes.  However, occasionally investigators would receive close proximity "pings" of HILL's location and determine HILL was staying at the Hilton-St. Louis "At The Ballpark" Hotel, located at 1 South Broadway, St. Louis, Missouri.  Days following, investigators initiated surveillance within the lobby area and the hotel surroundings in order to identify vehicle(s) HILL was utilizing.  Investigators discovered HILL was using multiple rental vehicles.

43.     On or about October 16, 2019, investigators were trying to track and locate HILL through the geo-location "pings" from his cellular device.  They were able to catch up to HILL's then current location because HILL remained stationary for three "pings", between the times of 9:07 a.m. to 9:38 a.m. at a Busey Bank in the City of St. Louis.  Investigators observed HILL exit the Busey Bank and enter a silver in color Mercedes SUV bearing Minnesota-based license plate CDD029, registered to Enterprise Leasing.  Investigators immediately discovered following and/or conducting surveillance of HILL was a difficult and dangerous task since HILL travelled

18

at high rate of speeds.   Continuing to utilize GPS "pings" from HILL's cellular device, investigators were able to observe that HILL traveled to and entered into an apartment complex on Gladstone within St. Louis County.  A short time later exit the apartment complex carrying a green in color bag, which appeared to be concealing an unknown, but weighty.  Investigators observed HILL re-enter the Mercedes SUV and depart the area, again traveling at a high rate of speed.  As the Mercedes entered the Express Lanes on east bound Interstate 70, the Mercedes began to travel in excess of 100 miles-per-hour.  To protect the investigators and the public from attempting to follow HILL at that those speeds, surveillance was immediately terminated.

44.     On or about October 14, 2019, investigators learned LEE was released from police custody for the stealing of a motor vehicle.  As a result, HARRIS no longer had direct communication with HILL to further drug operations.  Toll analysis of HILL's cellular device revealed HILL resumed communication with LEE immediately following LEE's release from police custody.

### E.     Attempted Interception of HILL's Cellular Device.

45.     On November 1, 2019, United States District Court Judge Audrey G. Flessig, Eastern District of Missouri, issued an order authorizing the interception of wire and electronic communications to and from HILL's cellular device.   (Cause No. 4:19 MC-848-AGF). Interception of HILL's cellular device was initiated on November 4, 2019.  However, it was terminated on November 11, 2019 after investigators determined HILL stopped using his cellular device on or about November 3, 2019.  To date, investigators have yet to identify HILL's new cellular device(s).  Furthermore, as noted above, HILL's moving from hotel to hotel causes great difficulty for investigators to not only pin-point a particular location for HILL, but to uncover the full scope of HILL's distribution organization.   Throughout the instant investigation,

19

investigators continued to monitor the **Subject Account**, and found HILL to continue to stay at high-end hotels and live what appeared to be a lavish life-style for a person without a known legitimate job.

**F.**  **Information from Cooperating Defendant.**

46.  On or about July 1, 2020, during an unrelated DEA investigation, members of DEA Strike Force 2 executed a Federal search warrant within the City of St. Louis. The target of the search warrant was an individual engaged in the distribution of controlled substances in an around the St. Louis area. That individual (hereinafter: Cooperating Defendant (CD)) stated he/she wished to cooperate with law enforcement.[3]

47.  During a post arrest interview of CD, CD indicated he/she is a multiple ounce distributor of fentanyl within the City of St. Louis. Furthermore, CD revealed he/she procures his/her fentanyl supply from "Skan". Members of DEA Strike Force 2, who were aware of my on-going investigation into "Skan" (HILL), immediately notified myself and co-case agent TFO Joseph Somogye. Although I was unable to attend, TFO Somogye traveled and was present during remainder of the interview of CD.

48.  In TFO Somogye's presence, CD explained HILL is a substantial fentanyl distributor directly associated with the St. Louis-based violent street gang "Minnow Mob". CD stated he/she typically acquires multiple ounces of fentanyl from HILL on a weekly basis. CD also confirmed investigators belief that HILL only resides in high-end hotels and is constantly

---

[3]  During the instant investigation, investigators have recently established the CD. CD began cooperating with investigators during the instant investigation. CD has prior felony convictions for drug and weapon offenses and is cooperating for judicial consideration. The information provided by CD has been corroborated and is believed to be reliable based upon law enforcement actions, including Facebook and telephone exploitation, and telephone toll analysis. CD's information has never been found to be false or misleading.

changing cellular devices.  However, CD only knows HILL to conduct drug-related matters through Facebook Messenger under the **Subject Account**.[4]  At that time, investigators showed CD **Subject Account**, which depicted the profile name "Ron Hill" and contained multiple photographs of HILL.  CD confirmed the Facebook account was used by HILL and specifically used to facilitate HILL's drug-related activities.  TFO Somogye questioned CD on about his/her knowledge regarding HILL's use of the **Subject Account** to facilitate his (HILL's) drug trafficking activities.  CD indicated he/she has personally communicated with HILL through the **Subject Account** to order multiple ounce quantities of fentanyl from HILL.  The CD told investigators he has been contacting HILL through Hill's Subject Account and Facebook Messenger for several months.  The CD stated that the last time he/she had communicated with HILL on the **Subject Account** using Facebook Messenger direct messages was approximately June 28, 2020.

### G.   Public Posted Activity on Subject Account.

49.     TFO Somogye informed me of the information learned in the interview of CD, and I then reviewed the **Subject Account** used by HILL.  Again, due to HILL's privacy settings for the **Subject Account**, I was limited to what I was able to view.  However, I discovered more publically-posted photographs and videos of HILL in **Subject Account** that had been added since my latest review of the **Subject Account**.  I located and viewed videos and/or photographs which depict HILL appearing to be conducting activities that are illegal or indicative of drug distribution, i.e. HILL using marijuana, HILL counting and/or possessing large quantities of

---

[4]     From my experience and training, I am aware that since the development of social media and/or application messaging platforms such as Facebook Messenger, WhatsApp, etc., that allow their users to communicate back and forth in real-time those users believe they can have sense of security of not being monitored or tracked by law enforcement.

21

United States currency[5], and HILL and an unknown male posing together for a photograph, with the unknown male carrying a pistol, with an extended magazine protruding from his waist band.

    a.    Posted February 6, 2018 to **Subject Account.**  The caption for the following photograph is "Back At It #StrictlyInCash":



    b.    Posted March 13, 2020 to the **Subject Account**.  My review of this video clip appears to show HILL counting a large bundle of cash.

---

[5]    I know from my training and experience, that posing for photographs with large amounts of US currency on social media sites is consistent with drug distribution, which is a cash-only business.  Drug distributors frequently pose on those social media sites with the proceeds from their sales in an effort to gain notoriety and respect in their professional and social circles.



c. Posted June 5, 2020 to **Subject Account depicting** HILL and an Unknown Male carrying a firearm in the waistband of his pants.



**H.    My Knowledge, Training and Experience.**

50.    From my knowledge, training and experience, as well as discussions I have had with other agents and personnel familiar with computer-related investigations, I know that it is common for individuals engaged in the criminal activities described herein to use social networking sites such as Facebook to communicate with one another and facilitate their criminal activities. Such communications and the facilitation of criminal activities include the use of these applications and electronic and stored data that would identify and describe: (a) other co-conspirators, aiders, and abettors who are participating in the illegal activities as well as the nature and scope of the illegal activities; (b) identify dates and locations where illegal activity has taken place or may take place in the future; (c) discussions concerning planning, operations, the transfer of information, concerning the illegal activities described herein as well as sharing photographs, videos, documents, and files, (d) financial transactions and monetary transfers used to facilitate and continue criminal activities as well as the existence and location of records, bank accounts, and businesses pertaining to those activities; (e) sales and purchases of equipment, materials, and goods used to aid the co-conspirators in their endeavors as well as the location and use of assets accumulated; (f) travel, safe-houses, and locations where goods, materials and personnel stay or are kept; and (g) the existence of other communication facilities, including telephones, computers, e-mail and other electronic accounts used to by co-conspirators to communicate.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

51.    I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the United States copies of the records and other information

24

(including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, United States-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

52.    Based on the forgoing, I request that the Court issue the proposed search warrant for **Subject Account #1**.  The United States will execute this warrant by serving the warrant on Facebook.   Because the warrant will be served on Facebook, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

53.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

54.    I further request that the Court order that all papers in support of this application, including the affidavit and warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.   Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution,

destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

**I state under the penalty of perjury that the foregoing is true and correct.**

Respectfully submitted,

James Gaddy
Task Force Officer
Drug Enforcement Administration (DEA)

**Sworn to, attested to, or affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41** this __9th__ day of July, 2020

SHIRLEY P. MENSAH
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Facebook account(s) and/or user ID(s):

> **(a) "Ron    Hill"    (https://www.facebook.com/profile.php?id=100007214386526) (ID#100007214386526)**, an account believed to be utilized by Ron HILL **(Subject Account #1)**;

that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company located at 1601 Willow Road, Menlo Park, CA 94025.

1

**ATTACHMENT B**

**Particular Things to be Seized**

**I.      Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f),

Facebook is required to disclose, from June 1, 2016 to present, the following information to the government for the account(s) and user ID(s) listed in Attachment A:

(a)     All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers;

(b)     All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

2

(c)    All records or other information regarding the devices and internet browsers associated with, or used in connection with, that account and user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(d)    All "check ins" and other location information;

(e)    All IP logs, including all records of the IP addresses that logged into the account;

(f)    All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(g)    All information about the Facebook pages that the account is or was a "fan" of;

(h)    All past and present lists of friends created by the account;

(i)    All information about the user's access and use of Facebook Marketplace;

(j)    The types of service utilized by the user;

(k)    The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(l)    All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(m)    All records pertaining to communications between Facebook and any person regarding the user or the account and user ID, including contacts with support services and records of actions taken.

3

(n)     Any and all cookies associated with or used by any computer or web browser associated with the account, including the IP addresses, dates, and times associated with the recognition of any such cookie;

(o)     All records of Facebook searches performed by the account;

(p)     All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(q)     All photos and videos uploaded by that account and user ID and all photos and videos uploaded by any user that have that user tagged in them, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(r)     All location data associated with the account created, uploaded, or shared by the account;

(s)     All other records and contents of communications and messages made or received by the user, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests.

**Facebook is hereby ordered to disclose the above information to the United States within 14 days of the date of this warrant.**

**II.     Information to be seized by the United States**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 21, United States Code, Sections 841(a), 843, and 846 and Title 18, United States Code, Sections 2, 922(g), and 924(c) involving Ron HILL, and others known and unknown from October 1, 2019 to present, including, for each account or user ID identified on Attachment A, information pertaining to the following matters:

4

(a) the sale of illegal drugs and steps taken in furtherance of schemes to sell illegal drugs;

(b) the possession of illegal firearms and steps taken in furtherance of schemes to come into possession of said firearms;

(c) the use of phones in furtherance of narcotic sales;

(d) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(e) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(f) The identity of the person(s) who created or used the account(s) or user ID, including records that help reveal the whereabouts of such person(s).

5

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Facebook, and my title is

_____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Facebook. The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

    a.    all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Facebook, and they were made by Facebook as a regular practice; and

    b.    such records were generated by Facebook's electronic process or system that produces an accurate result, to wit:

    1.    the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Facebook in a manner to ensure that they are true duplicates of the original records; and

    2.    the process or system is regularly verified by Facebook, and at all times pertinent to the records certified here the process and system functioned properly and normally.

6

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.


_____        _____
Date                                  Signature